## ROSEN et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. December 15, 1920.)

No. 62.

**1. Criminal law ⚙═1090 (19)—Transcript of record is not bill of exceptions.**

A transcript of the reporter's notes made during the trial does not constitute a bill of exceptions, nor is it made such by a stipulation of counsel, and the practice of printing such a record for the appellate court is strongly disapproved.

**2. Criminal law ⚙═1048, 1129 (1)—Judicial Code, § 269, does not relieve of the necessity of exceptions and assignments of error.**

Judicial Code, § 269, as amended by Act Feb. 26, 1919 (Comp. St. Ann. Supp. 1919, § 1246), does not require appellate courts to review cases without regard to the taking of exceptions and the usual assignments of error, nor relieve counsel from the necessity of calling the attention of the trial judge to errors or mistakes at the time they are made.

**3. Receiving stolen goods ⚙═7 (2)—Indictment need not allege knowledge of interstate character of transit.**

In an indictment under Act Feb. 13, 1913 (Comp. St. § 8603), for buying and receiving property stolen while being transported in interstate commerce, knowing the same to have been stolen, it is not necessary to allege that defendant knew that it was stolen while in course of transportation in interstate commerce.

**4. Receiving stolen goods ⚙═8 (4)—Presumption of guilt arises from possession.**

Proof that defendant was in possession of property recently stolen raises a presumption of guilty knowledge which in the absence of explanation may warrant conviction.

**5. Criminal law ⚙═508 (9)—Testimony of accomplices may warrant conviction.**

An instruction that the testimony of accomplices should be considered very carefully, but there was no rule of law in the federal courts which prevented conviction on the testimony of accomplices if the jury believed it, *held* correct.

**6. Criminal law ⚙═377—Evidence of good character admissible.**

Evidence of good character is to be considered in connection with all other evidence in the case in determining the guilt or innocence of the accused, and it is to be given such weight as under all the circumstances it is entitled to in the judgment of the jury.

In Error to the District Court of the United States for the Western District of New York.

Criminal prosecution by the United States against Louis Rosen and Jacob Rosen. Judgment of conviction, and defendants bring error. Affirmed.

This cause comes here on writ of error to the United States District Court for the Western District of New York.

The plaintiffs in error, who were defendants below, are hereinafter referred to as defendants.

The defendants were indicted together with Eugene Hanavan, Paul Vogel, Henry Weber, and Joseph Pfeiffer and were charged with the crime of receiving property stolen from a shipment of copper, knowing that the copper had been stolen. The crime was charged to have been committed at Buffalo, in the state of New York. The property consisted of 40,000 pounds of copper ingots which constituted a part of an interstate shipment of freight from the

⚙═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Calumet & Hecla Smelting Company at Hubbell, in the state of Michigan, to the Seymour Manufacturing Company at Seymour, Conn. At the time the copper was stolen it was in the custody and possession of the Erie Railroad Company, a common carrier of freight.

The defendants were indicted on July 29, 1919, and the trial was had at Canandaigua, N. Y., on September 15, 1919. The indictment contained a single count. The two Rosens were tried alone. At the trial Vogel, who was confined in the state prison at Auburn, having been convicted of another offense of a somewhat similar character, was examined as a witness on behalf of the government, having been brought from Auburn for the purpose under a writ of habeas corpus. Weber pleaded guilty to the indictment and was also sworn as a witness for the government. The two Rosens took the stand and testified on their own behalf.

The jury returned a verdict on September 17, 1919, finding the defendants Rosen guilty as charged.

Aaron Fybush, of Buffalo, N. Y. (Frank C. Ferguson, of Buffalo, N. Y., of counsel), for plaintiffs in error.

Stephen T. Lockwood, U. S. Atty., and John T. Walsh, Sp. Asst. U. S. Atty., both of Buffalo, N. Y. ( Carl Sherman, Asst. U. S. Atty., of Buffalo, N. Y., on the brief), for the United States.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). Before looking into the facts of this case upon the merits, we shall dispose of a preliminary matter of consequence to the court, the parties, and their counsel.

[1] We have been presented with what is entitled "bill of exceptions." It contains all the testimony taken at the trial, all that was said between court and counsel, the whole of the argument to the jury on behalf of the government, covering some 20 printed pages (although exception was taken to only two sentences covering some 6 or 7 lines), the whole of the charge (to which one exception was taken), and various other matters. It is followed by a "stipulation" signed by the attorneys for both parties. This is followed by an "order settling case" which states that—

"On the above stipulation the foregoing record * * * containing all of the evidence given and proceedings had upon the trial of this action is hereby ordered settled and placed on file in Erie county clerk's office."

This is signed by the District Judge.

It is hardly necessary to say that this is not a bill of exceptions. In Linn v. United States, 251 Fed. 476, 483, 163 C. C. A. 470, this court stated what constitutes a bill of exceptions, and we declared that in that case the bill should have never been signed by the trial judge, and that the court would not be subject to just criticism if we declined to consider the errors assigned. In Fraina v. United States, 255 Fed. 28, 166 C. C. A. 356, we again spoke plainly on this subject, and said:

"There is no bill of exceptions. Both parties have agreed to call what is probably a transcript of the stenographer's minutes by that name; but giving it the requisite name does not make it the lawful thing. The consent was worthless, and it is of grace only that we consider the points argued."

The Linn Case was referred to approvingly. In Buessel v. United States, 258 Fed. 811, 170 C. C. A. 105, we declared that the parties are not at liberty to substitute a written stipulation or agreed statement of

facts as to what occurred at the trial in lieu of a bill of exceptions. And it is only through a bill of exceptions duly authenticated as such that the rulings of a judge made at the trial become a part of the record to be reviewed. We take occasion to say once more that what we find in the present record is not a true bill of exceptions as such bills are understood in the federal courts, and that the practice of printing the whole of the stenographer's minutes, arguments and all, is, under the federal practice, a waste of a client's money, which is strongly disapproved. As has been said it "is neither lawyerlike nor just to the court or to client." We have several times before pointed out that bills of exceptions are not governed by the rules of the state courts under the Conformity Act (Comp. St. § 1537). Buessel v. United States, supra, and Rothman v. United States, 270 Fed. 31, decided at this term.

[2] We shall go into this case more fully than the record required, and in doing so we wish it understood that this case is not to be regarded as a precedent binding this court to examine into assignments of errors where no exceptions have been reserved. In a proper case we may consider errors not excepted to and which are not assigned for error. But we do not understand that Congress in passing the act of February 26, 1919 (40 U. S. St. at L. pt. 1, c. 48, p. 1181 [Comp. St. Ann. Supp. 1919, § 1246]), intended that cases could be reviewed in the appellate courts without regard to the taking of exceptions and the usual assignments of error. Whatever that act may mean, it certainly was not intended, among other things, to relieve counsel from the necessity of calling the attention of a trial judge to his mistake at the time an erroneous instruction or ruling is given in order that he may correct it then and there and avoid the necessity of setting a verdict aside and securing a new trial if a conviction improperly follows. This court has recently said in Storgard v. France & Canada S. S. Corporation (C. C. A.) 263 Fed. 545, 546, in reference to the act of Congress now under consideration:

"We do not construe the section as authorizing appellate courts to decide on the whole record whether exceptions have been taken or not. The mischief it was intended to correct is just the opposite of overlooking defects due to negligence, ignorance, or inadvertence, viz. the reversal of judgments because of errors, defects, or exceptions which, though raised with technical accuracy, do not affect substantial rights."

And also see Goldfarb v. Keener (C. C. A.) 263 Fed. 357.

The defendants Rosen have been convicted of the crime of receiving property stolen from a shipment in interstate commerce knowing that the property had been stolen. They have been sentenced to imprisonment at hard labor—Louis Rosen's term of imprisonment being for two years and Jacob Rosen's for three. They are described in the testimony as being engaged in the junk business. Vogel at the time the crime was committed was a clerk in the office of the Lehigh Valley Railroad Company and had charge of the making up of the grain sheets. At the time of the commission of the crime Weber had a coal yard adjoining the East Buffalo yards of the Lehigh Valley Railroad Company where he was engaged in the coal business. Vogel and Weber testified that the car containing the copper in question was put on the latter's

siding, and that they, with Hanavan and Pfeiffer, unloaded it and buried the copper in Weber's coal yard, where it remained until Vogel told him that he had a customer for it, explaining that the Rosens wanted it. The Rosens came on the same day and wanted to get samples of the copper to send to Rochester to a prospective purchaser, and in the presence of the two Rosens samples were taken from the spot where the copper was buried and handed to them. The Rosens, a few days later, came into the yard, the copper was dug out of its place of concealment, and was, by their help, placed in the car. Then after the loading was finished Jacob Rosen said to Vogel that he was afraid to bill the car and asked Vogel to bill it, which Vogel refused to do. And it was finally agreed that Jacob should bill it out as scrap metal, and the copper was covered over with fenders upon Louis Rosen's suggestion, who stated it was a good thing to do to cover up the identity of the shipment. The bill of lading was signed by Louis Rosen. There is no question as to the good faith of the parties in Rochester to whom the copper was consigned. There was much other testimony, 13 witnesses testifying for the government and 10 for the defendants.

[3] The indictment is based on an act of Congress passed February 13, 1913 (Comp. St. § 8603). That act provides as follows:

"That whoever shall unlawfully break the seal of any railroad car containing interstate or foreign shipments of freight or express, or shall enter any such car with intent, in either case, to commit larceny therein; or whoever shall steal or unlawfully take, carry away, or conceal, or by fraud or deception obtain from any railroad car, station house, platform, depot, steamboat, vessel, or wharf, with intent to convert to his own use any goods or chattels moving as, or which are a part of or which constitute, an interstate or foreign shipment of freight or express, or shall buy, or receive, or have in his possession any such goods or chattels, knowing the same to have been stolen; * * * shall in each case be fined not more than five thousand dollars or imprisoned not more than ten years, or both, and prosecutions therefor may be instituted in any district wherein the crime shall have been committed."

The indictment charges that the defendants did—

"knowingly, wrongfully, unlawfully, and feloniously have in their possession, buy, receive and conceal certain goods, and chattels, to wit, 40,000 pounds of copper ingots, * * * and each of them then and there knowing said goods and chattels to have been stolen, which goods and chattels had theretofore, to wit, on the 10th day of June, 1917, at the city of Buffalo, state of New York, been unlawfully and feloniously stolen from a certain railroad car known and described as follows, to wit: C., H. & D. car No. 4523—while said goods and chattels did move as and constitute a part of an interstate shipment of freight in course of shipment in interstate commerce," etc.

To sustain a conviction under the act it must be shown:

(1) That the goods and chattels involved were stolen.

(2) That at the time they were stolen they were articles of interstate transportation and in course of such transportation.

(3) That defendants came into possession of them.

(4) That they received them knowing them to have been stolen.

While the indictment charges that defendants knew at the time the goods and chattels are alleged to have been in their possession that they had been stolen, it does not charge that they knew they had been stolen from interstate commerce. But such an allegation is certainly unnec-

essary. A person who receives stolen chattels knowingly does so at the peril of their having been stolen while in course of interstate transportation. He cannot escape conviction because he did not know whether they were stolen in intrastate or in interstate commerce. Kasle v. United States, 233 Fed. 878, 882, 147 C. C. A. 552.

[4] That the copper came into the possession of the defendants cannot be doubted. Indeed by the admission of the defendants themselves the copper came into their possession. That they received it knowing that it had been stolen is equally clear. The possession of stolen property, standing alone, does not establish guilt. But the possession of property recently stolen raises a presumption of guilt which in the absence of explanation may authorize a jury to infer a criminal connection with its acquisition. Wilson v. United States, 162 U. S. 613, 620, 16 Sup. Ct. 895, 40 L. Ed. 1090; People v. Weldon, 111 N. Y. 569, 576, 19 N. E. 279. And in the instant case the possession of the copper by the defendants required them to make an explanation of their possession. And it was for the jury to say whether their explanation was satisfactory. The jury was instructed:

"The rule of law in the state of New York, and the rule in this court is now well settled, that recent possession, united with other circumstances of a peculiar and suspicious character, as, for instance, the failure to give a satisfactory explanation of possession, may warrant the presumption of guilty knowledge if it may reasonably be inferred from the circumstances that the possessor did not commit the larceny himself. * * * They claim they have explained, and, I repeat, if they have explained satisfactorily, if the account they have given of the manner in which they obtained possession of the property is truthful and satisfactory to you, they are entitled to an acquittal."

The instruction was right and was not excepted to at the trial.

Counsel for defendants, appreciating fully the fact that it was necessary for the government to show that the copper which the Rosens received into their possession was copper which had been shipped in interstate commerce, strenuously argued in this court that the government utterly failed to show that the copper was a part of the copper which was in course of interstate transportation. In the summing up to the jury counsel on behalf of the government stated that the charge was that defendants had feloniously received the copper "knowing it to have been stolen while in the course of shipment in interstate commerce." The court in his charge to the jury stated that defendants were indicted "for receiving goods stolen in interstate commerce." The court went on to say:

"That it is necessary that you should determine the preliminary question of fact, namely, you must determine that the controversy in which we are engaged is a controversy arising out of an interstate commerce shipment, and that the jurisdiction of the court depends upon that finding, and the burden of proof is upon the government to establish that we are here concerned with an interstate commerce shipment as distinguished from a local shipment, that is, a shipment between two points within the state."

The jury could not have misunderstood that it was necessary that the government should show that the copper the defendants received was an interstate commerce shipment, and, as there was evidence from which the jury were entitled to find that the copper was a part of the

shipment sent from the Calumet & Hecla Smelting Company at Hubbell, Mich., and which was on its way to Seymour, Conn., there is no necessity for inquiring further concerning it.

[5] Then it is said that all of the testimony which tends in any way to establish the charge against the defendants of having received stolen copper knowing it was stolen rests on the testimony of the witnesses Vogel and Weber alone, who confessed on the stand that they had stolen it. The testimony of these two witnesses, if believed, made it clear beyond doubt that the defendants knew that the property was stolen when they received it. The court in his charge told the jury that Vogel and Weber were accomplices, and instructed as follows:

"I do admonish you to scrutinize the testimony of these two witnesses with the utmost care. Compare it with other testimony in the case, compare it with all the facts and circumstances surrounding this transaction, to the end that you may satisfy your minds and consciences whether they testified to the truth or not. If, in your judgment, there are no surrounding circumstances tending to corroborate them, you will be justified in rejecting their testimony. But it is also the rule of law in the courts of the United States that there is no absolute rule of law preventing a conviction on the testimony of accomplices if juries believe them. Such is the rule in this court. Testimony of accomplices should be considered very carefully; it should be scrutinized with the utmost circumspection, especially if uncorroborated, although their testimony should not be rejected if it is believed, if it sustains the contention of the government, if there are facts and circumstances from which it can be plainly perceived by the jury that these men, criminals though they may be, participants in this crime though they may be, nevertheless have told the truth."

At common law a jury can convict upon the testimony of an accomplice, although it is not corroborated, if it satisfies the jury beyond a reasonable doubt. In many of the states statutes have been passed which expressly provide that a person cannot be convicted of crime on the uncorroborated testimony of an accomplice. But no such statute has been passed by Congress. It is, however, usual in the federal courts to caution juries in reference to such testimony. And in Holmgren v. United States, 217 U. S. 509, 510, 511, 524, 30 Sup. Ct. 588, 592 (54 L. Ed. 861, 19 Ann. Cas. 778), the court, speaking through Mr. Justice Day, said:

"It is undoubtedly the better practice for courts to caution juries against too much reliance upon the testimony of accomplices, and to require corroborating testimony before giving credence to them."

The charge of the judge in the instant case was proper. And there was much outside of the testimony of Vogel and Weber to convince the jury of the guilty knowledge of the Rosens. The purchase for 16 cents a pound from a railroad clerk of a carload of new ingot copper, having an established market value of 29 cents per pound, and the subsequent concealment from the railroad company by the Rosens of the true character of their shipment of it under the designation of it in the bill of lading as "scrap metal," although they invoiced it to the purchaser as copper ingots, and their covering the copper with 1,500 pounds of scrap auto fenders to prevent a discovery of the identity of the shipment, and other circumstances afforded evidence which the jury might well regard as convincing corroboration of the testimony of the accomplices.

[6] The court instructed as follows as to the testimony of the defendants' character witnesses:

"Testimony has been given by credible witnesses tending to show that their character as business men in the community in which they live is good, and I instruct you, gentlemen, that, this being a criminal case, you should take into consideration such testimony, especially if there is a doubt in your minds as to their guilt. If there is a doubt in your mind as to the credibility of the two witnesses regarding whose testimony I have said so much, then you may have recourse to the testimony regarding their good reputation. Indeed, the courts say that a man's good reputation in a case like this may often, of itself, create a reasonable doubt."

Counsel for defendants objects to the above instruction on the ground that the jury might well have understood the court to mean that, if they were inclined to believe Vogel's and Weber's testimony, they need pay no attention whatever to the evidence of the defendants' character witnesses, and we are told that a jury should always take into account the evidence of character witnesses, and that that testimony alone may be sufficient to prevent the jury from reaching a verdict of guilty. We might dispose of this objection by saying that, as no exception was taken to it, when given, the matter is not properly before us, and might very properly be ignored. We will, however, say that the jury could not have been misled by it. In Edgington v. United States, 164 U. S. 361, 366, 17 Sup. Ct. 72, 73 (41 L. Ed. 467), the court stated the rule on this subject as follows:

"Whatever may have been said in some of the earlier cases to the effect that evidence of the good character of the defendant is not to be considered unless the other evidence leaves the mind in doubt, the decided weight of authority now is that good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing."

Evidence of good character is to be considered in connection with all the other evidence in the case in determining the guilt or innocence of an accused person, and it is to be given such weight as under all the circumstances it is entitled to in the judgment of the jury. We do not think the accused in this case were prejudiced by the instruction.

This court is satisfied that defendants had a fair trial and were properly convicted of the crime for which they were indicted.

Judgment affirmed.